Good morning. May it please the court. My name is Mitchell Hendy, and I'm appointed counsel for Petitioner Stella Fonkeng. If I may, I'd like to reserve two minutes for rebuttal. This petition raises two questions of error that the BIA committed, two procedural defects in denying my client asylum, withholding a removal, and protection of the convention against torture. First, the BIA's three-sentence disposition of the CAT claim fails to comport with this court's precedent requiring a separate, independent analysis of all of the evidence in support of a CAT claim. Since this court's decision in Camalthus in 2001, the court has required the BIA to independently analyze all evidence submitted in a CAT claim. But that includes or subsumes a credibility determination. So if a petitioner or their respondent is deemed not credible, then their testimony, which is deemed not credible, is not part of the analysis, or at least it doesn't supply facts in support of the claim. Yes, Your Honor. The adverse credibility determination may still be relevant, but the court's decision in Camalthus makes clear that the credibility determination can't wash over and dispose of entirely the CAT claim. My client submitted a voluminous amount of evidence in addition to and supporting her claim for asylum and relief under the Convention Against Torture. This included a doctor's report who specializes in treating torture victims. That report stated that the scars my client has are consistent with the types of torture and persecution she testified to. And that portion of her testimony was never refuted by the BIA. Once a witness is deemed not credible, the agency is entitled to discount all of it. And the fact that something is consistent, or some other person has found her to be credible, I don't understand how that affects it. Well, Your Honor, I think that the other extrinsic evidence, disregarding for the moment her testimony, the other extrinsic evidence could have established her eligibility for relief under the CAT. She submitted a lot of country-conditioned evidence demonstrating that people such as political dissidents and perceived lesbians are subjected to torture in Cameroon. And that evidence, under Kamauthus, and in no fewer than six cases in the past year, that evidence shows has to be considered by the BIA before they make a determination on the merits of the CAT claim. And the credibility determination, as the second point in this petition raises, the credibility determination in this case is severely flawed because under pre-Real ID Act law, a credibility determination must go to the heart of the claim. Now here, one of the main inconsistencies relates to the very reason for her coming to the United States. And it's hard to imagine anything closer to the heart of the claim than why is she here? And to say, I'm here to attend my brother's wedding versus I'm here because I'm the victim of political torture are completely inconsistent reasons and they would seem to go to the heart of the claim. Well, McClain testified before the IJA consistently that she, the main reason, quote, the main reason for her arrival in the United States was to flee for her life because of her persecution. Now the government submitted some evidence suggesting that there was a wedding and the IJA decided to credit that. But this court has always held that there can be multiple reasons in support of a petitioner's application for asylum. There can be multiple. Now you're changing theories a little bit because what you're now saying is, well, maybe it goes to the heart of the claim, but that wasn't really, maybe she should have been deemed credible, but it's a legal question whether the reason for coming to the United States or the main reason or all the reasons relate to the basis for asylum or relate to some personal vacation. Well, this court has not really clearly defined what the outer boundaries of the heart of the claim are. But looking at cases like Akinmode, it's pretty clear that what's required is a nexus to the central elements of the claim. And that looks to the statute of what a refugee is and what is needed to prove asylum. And that requires two elements, whether or not she's a member of a particular social group and whether or not she had a fear of persecution or was persecuted. And that second part, is this on? Yeah. Usually I don't have a problem being heard. And that second part is based on credibility, right? Whether or not the persecution. Yeah, whether she has a fear of persecution. That is some credibility. Yes, Your Honor. And she's found to be not credible. So I don't know why it doesn't go to the heart. Because she was found not credible on reasons completely unrelated to the testimony she gave regarding her persecution. The BIA never said she was not persecuted. The BIA never said that she was not subjected to this tribal ritual of bleeding. None of those findings were ever made before the court. So as it stands, no adverse credibility determination is made regarding the heart of the claim, regarding the statutory elements for asylum. And it's important to- Well, why isn't it? When she says, I came here to attend my brother's wedding, why isn't that some evidence that she came for that reason and not for other reasons? I know you can have many reasons for doing it. But if you have for doing any single act, but if there's one reason that you give, that tends to undermine the weight of a second reason that's given, isn't it? Doesn't it? Yes, Your Honor. But I think that there's two points here. First, when she testified or when she told people that she was coming for her brother's wedding, and that's at the port of entry in Detroit, that was a lie. She has explained to the IJ that the main reason for her coming was to flee for her life. And that this court has held in cases that it's okay to tell a lie in order to gain- Except that the agency permissibly found that it wasn't a lie, that there was a wedding of someone with her brother's name and so on and so forth. So it's all wrapped up together. It's true that we have those cases, but it seems to me that the BIA addressed that quite directly and said, we find credible the evidence that she actually did come for her brother's wedding. And now her repudiation of that is the lie. And remember, our standard of review is we would have to be compelled by the evidence to come to a different factual conclusion here about her credibility. Yes, Your Honor. But this court still reviews de novo the question of whether or not it goes to the heart of the claim. And I think that based on cases like Akinmad and Aguilar-Ramos, instances in which testimony that's incidental to whether or not she was persecuted does not go to the heart of the claim. And while the IJA did make a finding in support of the government's evidence suggesting that there was this motive of coming for a wedding, my client consistently testified that the main reason was for fleeing this persecution. Did you want to save some rebuttal time? Yes, please, Your Honor. We're just about there. Thank you. Thank you. You'll hear from the government. May it please the court. My name is Samuel Lago, and I represent the United States in this matter. According to petitioner's testimony, petitioner escaped persecution from her mother's village in Cameroon for a lesbian relationship with the help of a masked man who put her on a boat and gave her some money. After leaving the boat, she was walking on the street when a stranger, Mr. Williams, a seemingly wealthy and influential man, asked if she needed a ride. She accepted and lived with Mr. Williams for a week and a half. He dressed her in very expensive clothes and makeup, had photos taken of her, had photos taken of her with another man who was really dressed, and left for three days. Mr. Williams then returned with several false documents, including a Cameroonian passport with a United States visa, a receipt for a national identity card, and a marriage certificate. Petitioner gave Mr. Williams all her real documents, and Mr. Williams showed petitioner the fake passport, told her she was going to the United States of America to take asylum and to expose the wrongdoings of the Cameroonian government. Mr. Williams also showed petitioner a fake marriage certificate and said her name is now Mrs. Bissong, and she is now a married woman. According to petitioner's testimony, Mr. Williams then gave the fake passport, marriage certificate, and receipt for the national identity card to petitioner. She was able to leave Cameroon, according to her, because she was wearing makeup, and because authorities were looking for a single Stella and Jen Kang Fong Kang, rather than a married Stella and Jen Kang Fong Kang espoused Bissong. She flew to Detroit, then Atlanta, where she was to meet Mr. Armstrong, Mr. Williams' friend. When she arrived in Atlanta, she contacted Mr. Armstrong, who told her she is now living in Fontana, California. She then took a bus from Atlanta to California. Mr. Armstrong then took her in, but then held her in involuntary servitude, according to her testimony. But he also helped petitioner file asylum, bringing her her blank form to file asylum and giving her a ride to her asylum interview. Your Honor, here the record evidence does not compel the conclusion that a petitioner was credible and supports the agency's adverse credibility in this matter. Her testimony that she left to free the persecution is inconsistent with the documentary evidence showing she left Cameroon to attend her brother's wedding, and that inconsistency goes to the heart of the petitioner's asylum claim. As this court will tell, testimony about the events leading up to an asylum petitioner's departure go to the heart of the claim for the purposes of making an adverse credibility determination. Here the evidence shows that first, although she testified Mr. Williams drafted her visa application without any of her biographical information, and that the reason of attending her brother's wedding was made up in Detroit in front of the immigration officials, her non-immigrant visa application lists her full name, her picture, her home address, the school she attended, the name of her son's father as her spouse, Bizong Bonaventure, but spelled with an E instead of an I, and the name of her father, Barnabas Fongkin Fongkang, as the person she would be traveling with. It also states that the purpose of the trip, of her trip to the United States, was to attend the wedding of her brother, Joseph Fongkin Fongkang, and would be staying in Lawrenceville, Georgia. Petitioner does not explain how she and Mr. Williams independently came up with the same story regarding a non-existent brother, Joseph, to procure entry into the United States. Mr. Williams, while filing her visa application in Cameroon, and she, spontaneously, while speaking with immigration officers in the Detroit airport. Second, even though petitioner claims she obtained her visa through Mr. Williams in August 2003, the visa itself shows it was issued in May 15th, 2003. Third, even though petitioner says she did not attend a visa interview, an email from the U.S. Embassy indicates an interview was conducted before the visa was issued. Fourth, even though petitioner claims to have made up her brother, Joseph, the record shows that a person named Joseph Fongkin Fongkang, son of Mary and Barnabas, was living in Georgia at the time, and petitioner's parents are also named Mary and Barnabas. Fifth, even though petitioner claims she fooled Cameroonian authorities because her passport shows her wearing makeup, her passport bears two photos of her, one with makeup and one without. Sixth, even though petitioner testifies she was not married and had no idea where their son's father was, and claims the marriage certificate she submitted was another false document created by Mr. Williams, a forensics evaluation indicates the marriage certificate bears indicia of authenticity, the man pictured in the certificate looks identical to the son Bonaventure, the son's father, and Mr. Bonaventure arrived in the United States one day after the petitioner. And seventh, even though the petitioner testified that her son, Joel Aristide Mabella, has at all times remained in Cameroon under the care of her mother in Cumbia, the record shows on August 17th, 2005, an alien number was established for Joel Aristide Fonking Mabella, born October 1st, 2000 to Stella and Bonaventure. Your Honor, while this court has found that minor consistencies that reveal nothing about an asylum applicant's fear for safety are not an adequate basis for an adverse credibility finding, inconsistencies regarding events that form the basis of the asylum claim are sufficiencies for adverse credibility determination. Testimony about the events leading up to the petitioner's departure or circumstances that led to the persecution go to the heart of the claim. Here, the inconsistencies are not small typographical errors or date attributable language problems or just also typographical errors, but a failure to remember these instances pertain to whether she fled Cameroon on the run from authorities after being persecuted for being a lesbian, or whether she's actually in a heterosexual marriage as the authenticated marriage certificate shows with the child and went through the process of obtaining a visa as a non-immigrant visa application shows, filling out her visa application with specific details known only to her, not a stranger, and attending her visa interview to come to the United States to attend her brother's wedding. Would you address the other claim that there was insufficient independent analysis of the Catt claim? Yes, Your Honor. Contrary to petitioner's assertions, the agency properly evaluated petitioner's Catt claim. The immigration judge noted in his decision, he not only considered petitioner's testimony, but he also considered the photographs she submitted, the letter from Dr. Quiroga, and the voluminous documentation on the treatments of gays and lesbians in Cameroon. However, it is petitioner's burden to establish she would be tortured if removed to Cameroon, and it's because she's not testified credibly that her claim for Catt protection fails. As the immigration judge noted, absent credible testimony, the evidence submitted by petitioner regarding country conditions in Cameroon does not suffice to demonstrate that she is more likely not to be tortured if returned to Cameroon. This shows the immigration judge properly considered the country conditions as part of the petitioner's Catt claim, but ultimately found that petitioner didn't meet her burden of establishing she would be tortured if removed to Cameroon. The immigration judge properly considered the photographs and the letter by Dr. Quiroga, stating that this evidence as a whole merely creates a possibility, not a probability, petitioner was harmed in ways she describes. The board then evaluated the immigration judge's decision to determine whether he failed to separately analyze the Catt claim, and they found no error in the immigration judge's decision. The board correctly noted that the basis for petitioner's Catt claim is not independent from the basis from her asylum claim, because her Catt claim, her claim for Catt protection was based on the same evidence, and the statements relied upon for her asylum claim, which the agency found to be not credible. So, Your Honor, this board's decision does not conflict with the case law of this court, the agency properly considered all the evidence related to petitioner's Catt claim, including the country conditions, and properly found that petitioner failed to show she is more likely than not to be tortured if removed to Cameroon, as the supporting testimony she relied upon was found to be not credible. Thank you, Counsel. Thank you. Mr. Hennie, you have a couple of minutes remaining for rebuttal. Thank you, Your Honor. First, Your Honor, as to the heart of the claim analysis and the inconsistencies opposing counsel just identified, it's important to note that many of those inconsistencies are not properly on review here before this court. Under this court's decision in Teckle, this court can only review the decisions, the reasons given by the BIA, and the IJ is reasoning in support of those explicit reasons. So, opposing counsel's reference about possible heterosexual marriage is found nowhere in the BIA's record and nowhere in the BIA's decision or in the record below, and that is not the basis for an average credibility determination in this court. As to the Catt claim, it is clear under Camalthus that all extrinsic evidence, and in particular, the country conditions, must be considered, because under this Catt claim, it's a separate standard of relief. Here, it's not just Ms. Fonking's statements that are supporting her CAT claim. Rather, there's tons of extrinsic evidence, including declarations from her relatives and from family members who show that she was tortured, and after she left Cameroon, police continued to search for her, and this is in addition to the voluminous country conditions that show that lesbians and perceived political dissidents are subject to torture in Cameroon. The BIA considered none of this, and neither did the IJ in any detail. In fact, the IJ said, had Respondent testified credibly, this may have lent credence to an argument that torture would be probable if Respondent was returned to Cameroon. That statement alone shows that the IJ and the BIA over-relied on this adverse credibility determination, and let it wash over the entire claim without truly considering, in light of the declarations, the expert reports, and the country conditions, whether or not Ms. Fonking would be tortured if she was returned to Cameroon. If your honors have no further questions, I'd rest on the briefs. Thank you. I don't believe we do. Thank you so much. Thank you. The case just urgently submitted.
judges: Breyer, Kozinski, Graber